UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| TERRY DILLWORTH, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:20-CV-629-CHB |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| CHRISTINE WORMUTH, SECRETARY | ) | **AND ORDER** |
| OF THE DEPARTMENT OF THE ARMY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on the Motion for Summary Judgment filed by Defendant Christine Wormuth, Secretary of the Department of the Army.[1]  *See* [R. 48].  Plaintiff Terry Dillworth responded, *see* [R. 51], and the Secretary replied, *see* [R. 53].  The matter stands submitted for review.  For the following reasons, the Secretary's Motion will be granted.

## I.   Background

Through this action, Dillworth brings gender discrimination and retaliation claims under Title VII of the Civil Rights Act of 1964 based on the treatment he alleges he experienced while employed at the Civilian Personnel Advisory Center (CPAC) at Fort Knox, Kentucky.  *See* [R. 22 (Second Amended Complaint), p. 1 & ¶ 10]; *see also* [R. 51 (Dillworth Response), p. 1] ("Terry Dillworth, a male federal sector employee, experienced discrimination based on sex by two

---

[1] The caption to the Secretary's Motion lists John E. Whitley as Secretary of the Department of the Army. *See* [R. 48, p.1].  The Current Secretary of the Army is Christine Wormuth. *See Secretary of the Army: Christine Wormuth*, U.S. ARMY, https://www.army.mil/leaders/sa/bio/ (last visited February 27, 2024). Thus, it is appropriate for the Court to automatically substitute Wormuth as the defendant herein. *See* Fed. R. Civ. P. 25(c) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending.  The officer's successor is automatically substituted as a party.").

females, both with managerial authority, over a protracted timeframe beginning around October 2018, with protected EEO activity starting in February 2019 which caused retaliation in several forms[.]").   The following facts are drawn from deposition transcripts, affidavits, and other documents that have been filed in the record.

Dillworth, an African American male, started working as an employee with the Army at Fort Knox in March 2015.  *See* [R. 48-2 (Dillworth Deposition), pp. 1, 25 (21, 249)].[2]  Before that, Dillworth had worked for a company by the name of InspiriTec, and before that, he worked as a work-study with Fort Knox for around six months while he was obtaining his bachelor's degree.  *See id.* at 1 (21).  Linda Robinson hired Dillworth for the initial position as a work-study employee.  *See id.* at 1–2 (21–22).

Dillworth started at CPAC as a GS-5 Human Resources Specialist in the Civilian Human Resources Agency (CHRA), *see* [R. 48 (Secretary Motion), p. 2], and to his recollection, he saw the position on USAJOBS.  *See* [R. 48-2 (Dillworth Deposition), p. 2 (22)].  Robinson had encouraged Dillworth at one time that if he made himself available and qualified that she may be able to pull him in to CPAC, and she was the person who ultimately selected and hired Dillworth for the GS-5 position.  *See id.*  During Dillworth's time at CPAC, Robinson was his supervisor, and she, at times, gave him performance awards and promoted him to new positions.  *See* [R. 48-1 (Dillworth Employment Records)].  She even named him "Employee of the Month" on one occasion.  *See* [R. 48-3 (Robinson Deposition), p. 31 (134)].

Over several years, Dillworth worked his way up from a GS-5, eventually becoming a GS-11 in March 2018.  *See* [R. 48-1 (Dillworth Employment Records)]; *see also* [R. 51-1 (Dillworth

---

[2] The full transcripts of the depositions in this matter do not appear in the record.  *See, e.g.*, [R. 48-2 (Dillworth Deposition)].  The Court will therefore cite to the PDF page numbers, followed by internal pagination and line numbers as necessary for clarity.

Deposition), p. 3 (23)]. GS-11s have more responsibilities and are assigned specific customers. *See* [R. 48-2 (Dillworth Deposition), p. 10 (74)]. They are also subject to more critiquing at the full performance level. *See* [R. 48-3 (Robinson Deposition), p. 7 (55:21–23)] ("At the full performance level, you are to take the training that you received as a trainee and apply it to your job.").

During his progression from a GS-5 to a GS-11, Dillworth was provided extensive training, including a basic staffing course when he first started, on the job training, and certain specific training courses. *See* [R. 48-2 (Dillworth Deposition), pp. 3–6 (33–36)] (describing the more than 100 hours of training he received); *see also* [R. 48-3 (Robinson Deposition), p. 58 (166:4–7)] (listing training courses that Dillworth and other specialists doing the same work received as including "[b]asic staffing, basic user staff -- HR staffing, HR advisory pay setting, guide the personnel processing actions, qualification standard handbook, time in grade," among others). Still, Dillworth testified that he had been unable to (or was not permitted to) participate in two other training courses. *See* [R. 48-2 (Dillworth Deposition), pp. 6–8 (36–38)]. But he also admitted that neither Robinson, his supervisor, nor Sandra Bussell, his team lead, was responsible for his inability to participate in those classes. *See id.*; *see also* [R. 51-2 (Robinson Deposition), p. 2 (37)]. Further, Dillworth testified that Robinson had provided him with approval to take certain training courses. *See* [R. 48-2 (Dillworth Deposition), p. 5 (35)].

In the summer and fall of 2018, individuals in leadership at CPAC identified issues with Dillworth's performance, including that he was not timely executing specific tasks. *See* [R. 48-4 (Emails), pp. 3–6]; *see also, e.g.*, [R. 48-3 (Robinson Deposition), pp. 41–42, 64–67 (144–45, 176–79)] (discussing various errors by Dillworth); [R. 48-7 (Bussell Deposition), pp. 6–8 (129–30, 133)] (same). Relevant here, the record contains numerous emails from Bussell to Dillworth in

May, June, July, August, and September of 2018 requesting that he take certain actions. *See* [R. 48-4 (Emails), pp. 3–9]. For example, on August 16, 2018, Bussell emailed Dillworth and stated: "Your inbox indicates this action has been referred for 14 days, however, USASTAFFING does not show that a cert has been issued. PPP was opened on 30 Jul and remains open. Please review the action ASAP. PET status should be updated if the cert has not been issued." *Id.* at 3. After emailing Dillworth that day, Bussell forwarded the email to Robinson and noted that Dillworth's errors were "not the usual types of errors" and that Dillworth "need[ed] some help." *See id.*

Over the next few days and weeks, Bussell and Robinson communicated about Dillworth and how to help him. For instance, on August 17, 2018, Bussell emailed Robinson and suggested "a plan to help him succeed." *See id.* at 11. Bussell noted that Dillworth was a GS-11 and that he was making too many mistakes with the priority placement program (PPP), timely and correctly updating information, responding to inquiries, following up on actions timely, and working with certain tickets. *See id.* Errors by Dillworth continued to occur into October of that year, and on October 11, 2018, Bussell noted that Dillworth was "still struggling to maintain his inbox" and that others were assisting him while he was on leave. *See id.* at 17. Notably, on that same day, Robinson met with Dillworth to discuss the errors he was making. *See* [R. 48-5 (Memorandum)] ("On 11 October 2018, I met with you to discuss the errors that you were making as a full performance GS-0201-11[.]").

Another incident occurred a few days later, when on October 17, 2018, Robinson emailed Dillworth about how she had to apologize to Cadet Command and correct an error Dillworth had made regarding whether an individual was eligible for a position. *See* [R. 48-4 (Emails), p. 1]; *see generally, e.g.*, [R. 48-3 (Robinson Deposition), pp. 64–67 (176–79)] (discussing Julie Stader's concerns with Dillworth's performance); [R. 48-7 (Bussell Deposition), pp. 6–7 (129–30)] (same).

- 4 -

Robinson told Dillworth that the error had placed her "in the hot seat" and that she had been asked to assure Cadet Command that the error would not happen again. *See* [R. 48-4 (Emails), p. 1]. The record indicates that, when Robinson apologized for the error, she communicated with Julie Strader, a supervisor at Cadet Command (the 1st Brigade), which was one of Dillworth's customers. *See id.* at 1–2; *see also* [R. 48-3 (Robinson Deposition), pp. 19–20 (84–85)]; [R. 48-2 (Dillworth Deposition), p. 11 (87)].

As a culmination of Dillworth's history of errors, he was placed on a three-month success plan beginning October 29, 2018. *See* [R. 48-5 (Memorandum)][3]; *see also* [R. 48-3 (Robinson Deposition), p. 2 (42)]. A success plan is an informal type of corrective measure, which Robinson created "in order to help Mr. Dillworth be more successful in his work." [R. 48-3 (Robinson Deposition), p. 2 (42:13–14)]. Robinson testified that a success plan had never been used with other individuals, but it was a plan for Dillworth and Robinson to meet on a regular basis for Dillworth "to be able to keep up with his work." *Id.* at 2, 7 (42:16–17, 55). Robinson met with Dillworth several times while he was on his success plan to discuss his deficiencies. *See id.* at 7 (55); *see also* [R. 48-5 (Memorandum)].

As a GS-11, Dillworth had certain performance elements that he had to meet, and during the time period he was on the three-month success plan, GS-11s were only permitted to have three PPP reconstructs while using the Automated Stopped and Referral System (ASARS) during a rating period.[4] *See, e.g.*, [R. 48-3 (Robinson Deposition), pp. 4, 36–37 (44, 139–40)]. When his

---

[3] Although this memorandum primarily concerned Dillworth's placement on a Performance Improvement Plan, it also discussed his prior placement on the three-month success plan.

[4] Dillworth describes ASARS as "a software program used to advertise government jobs for military spouses, dislocated veterans, and overseas veterans." [R. 51 (Dillworth Response), pp. 2–3]. He further explains that "[a] reconstruct typically occurs when an employee of CPAC creates an error in coding a job that causes an applicant or potential applicant to either not be able to apply, get rejected from a job, or a job gets closed without applicants." *Id.* at 3.

success plan began, Dillworth had three reconstructs, and he was warned that if he had a fourth, he could be placed on a Performance Improvement Plan (PIP). *See* [R. 48-2 (Dillworth Deposition), p. 19 (103)]. A PIP is a formal corrective measure "that lays out the deficiencies of what the specialist did" and then also sets out the actions that the specialist needs to improve upon. *See* [R. 48-3 (Robinson Deposition), p. 3 (43:3–6)]. A PIP is created through the Department of the Army. *See id.* (43:10).

Before Dillworth's three-month success plan lapsed, a fourth reconstruct of his was discovered,[5] which led to him being placed on a PIP. *See* [R. 48-8 (PIP)]; *see also* [R. 48-5 (Memorandum)]. Robinson testified that Dillworth's placement on a PIP was mandatory because of his fourth reconstruct and that she sought guidance from human resources before placing Dillworth on the PIP. *See* [R. 48-3 (Robinson Deposition), pp. 36–37, 40–41 (139–40, 143–44)]. Robinson also testified that she had never had an employee other than Dillworth who had more than three PPP reconstructs in a rating cycle. *See id.* at 46–47 (150–51). Similarly, Bussell testified that she had never been involved in another individual's placement on a PIP and that, in her thirteen years at CPAC, Dillworth was the only person she had seen placed on either a success plan or a PIP. *See* [R. 51-7 (Bussell Deposition), pp. 3–4 (58–59)]. Further, although Dillworth alleges that other employees had as many reconstructs as he did, he admitted in his deposition that he only had "speculation" to support his beliefs. *See* [R. 51-1 (Dillworth Deposition), p. 30 (133:17)].

---

[5] In his briefing, Dillworth argues that the fourth reconstruct was based on "stale criteria." *See, e.g.*, [R. 51 (Dillworth Response), p. 16]. In his deposition, Dillworth described the fourth reconstruct as being discovered retroactively, *see* [R. 48-2 (Dillworth Deposition), p. 20 (109)], but he did not testify that it was outside of the rating cycle or was otherwise improper to count. Thus, the evidence in the record on this point comes from Robinson's deposition, where she testified: "Mr. Dillworth was placed on the Performance Improvement Plan when he received his fourth PPP reconstruct within the rating cycle." [R. 48-3 (Robinson Deposition), p. 36 (139)].

On December 17, 2018, Dillworth met with Robinson for an initial PIP discussion.  *See* [R. 48-6 (PIP Discussion)].  In a memorandum of meeting from that discussion, Robinson observed that Dillworth was "performing at an unacceptable level" and noted specific actions Dillworth needed to take while on his PIP, including that he was to have certain tasks (PPP requisitions, job offers, referrals list, and coding of RPAs[6]) reviewed by a team lead, that he could not have another GS-11 Specialist review any of his actions for accuracy and or complete actions for him, that he would continue to have the same workload, and that if he needed assistance, he had to consult the team lead and/or supervisor to determine "how and/or who will complete or work product."  *See id.*  The memorandum also noted that Robinson had recommended remedial training for Dillworth, including basic staffing, basic user staffing, and HR classes.  *See id.*

The PIP itself highlighted nine issues with Dillworth's performance and listed steps that he needed to take to achieve the fully successful level, again including that he was to have certain tasks reviewed by a team lead and that he could not have another GS-11 Specialist review or assist with his work.  *See* [R. 48-8 (PIP)]; *see also* [R. 48 (Secretary Motion), p. 6] (discussing PIP).  The PIP also noted that Robinson had recommended remedial training and set out specific dates when she, Bussell, and Dillworth were to meet together.  *See* [R. 48-4 (PIP), p. 3].  When Dillworth was presented with the PIP, he refused to acknowledge receipt of the plan.  *See id.*

Dillworth's PIP was originally set to last 90 days, from December 31, 2018, to March 30, 2019.  *See id.* at 1.  However, it was extended through April 22, 2019, because Dillworth was absent some in February and March of that year when his brother died.  *See* [R. 48-11 (PIP Completion Memorandum)]; [R. 48-3 (Robinson Deposition), p. 39 (142)].  The extension of Dillworth's PIP was required by regulation, and Robinson discussed the extension with human

---

[6] The Court understands RPAs to reference "recruitment personnel actions."

resources. *See* [R. 48-3 (Robinson Deposition), pp. 38–41 (141–44)]. One effect of Dillworth's being placed on the PIP was that, while he was on the plan, he was unable to obtain a within-grade increase (WIGI) of pay.[7] *See* [R. 48-10 (WIGI Memorandum)]. Relevant here, Bussell testified that individuals are automatically denied a within-grade increase of pay if they fail a performance appraisal. *See* [R. 48-7 (Bussell Deposition), pp. 11–12 (136–37)].

During the course of his PIP, Dillworth sought a mental health evaluation in January 2019 through Veterans Affairs to see if there was some medical explanation for his inability to focus and lack of attention to detail. *See* [R. 48-9 (Medical Records)]; *see also* [R. 48-2 (Dillworth Deposition), p. 26 (250)]. During his deposition, Dillworth explained:

> Actually that's what I was accused of so many times that I wanted clarity to see if there was anything actually true to what I was being accused of because I started to second-guess myself. I was harassed and tormented so much. So that's why I requested this evaluation to prove the fact that there was nothing wrong with my attention to detail.

[R. 48-2 (Dillworth Deposition), p. 26 (250:4–11)]. According to Dillworth's medical records, the evaluation concluded that the evidence did not provide strong support for a diagnosis of ADHD at that time and noted that his reported chronic pain and anxiety could contribute to his issues. *See* [R. 48-9 (Medical Records), p. 3].

In February 2019, two months after being placed on the PIP, Dillworth filed a complaint alleging gender discrimination with the Equal Employment Opportunity Office regarding his placement on the PIP. *See* [R. 48-2 (Dillworth Deposition), p. 22 (121)]; [R. 51-1 (Dillworth Deposition), p. 27 (122)] (discussing first EEO contact as occurring in January 2019); *see also* [R. 23-1 (EEO Complaint)]. Around that time, he also filed a complaint with the Merit Systems

---

[7] During his deposition, Dillworth also referenced a promotion he applied for but did not receive. *See* [R. 51-1 (Dillworth Deposition), pp. 58–59 (281–82)]. However, he admitted the promotion was not part of this lawsuit. *See id.* at 59 (282).

Protection Board (MSPB) regarding "procedural errors" that he felt had been made regarding the justification for placing him on the PIP (specifically, the fourth reconstruct) and for withholding his WIGI increase.  *See* [R. 51-1 (Dillworth Deposition), pp. 15–16 (77–78)]; *see also supra* n.5.

While he was on his PIP, Dillworth met with Bussell and Robinson, who provided him "Performance Feedback."  *See* [R. 48-11 (PIP Completion Memorandum)].  On April 22, 2019, after reviewing Dillworth's work products and observing that he had no more PPP reconstructs, Robinson concluded that Dillworth achieved the results of Fully Successful (level 3) while on his PIP.  *See id.*  Thus, Dillworth successfully completed his PIP on April 22, 2019, and because he did so, his within-grade increase was also approved at that time.  *See id.*  Still, Dillworth was advised that he needed to maintain a fully successful level of performance for one year from December 31, 2018 (the date his PIP began), and he was warned that, if he failed to maintain his performance standards, appropriate personnel action could be taken against him, including removal from federal service, without the benefit of another PIP.  *See id.*  Dillworth was again directed that he was to have certain tasks checked by his team lead, that he would continue receiving actions for his serviced organizations, and that if he felt he needed assistance, he should inform someone like Bussell or Robinson, who would decide if assistance was needed and who would assist.  *See id.*  Dillworth was informed that his work products were not to be completed by another person without approval from Robinson or the team leads.  *See id.*

Dillworth's completion of his PIP in April 2019 did not mark the end of his performance issues.  Instead, on August 2, 2019, Dillworth received written counseling regarding his failure to timely extend a tentative job offer.  *See* [R. 48-12 (Written Counseling)].  According to that counseling, during a Strategic Recruitment Discussion training at Cadet Command on July 30, 2019, Strader, a supervisor at the 1st Brigade, told Robinson that Strader should not have to come

to Dillworth to ask when a job offer would be extended.  *See id.* at 1.  At the training, Strader said that she had returned a referral list to Dillworth with a selection on July 22, 2019, and that the offer had still not been extended to the selectee.  *See id.*

In the written counseling, Robinson advised Dillworth that Strader had a valid complaint due to the tardiness of the tentative job offer under CHRA Guidance.[8]  *See id.*; [R. 48-2 (Dillworth Deposition), pp. 16–17 (93:22–94:3)] ("Q  So in August 2019, around the time of the meeting with Ms. Strader, you said that you made an error but now you're going to claim that you did not make an error?  A  Well, I'm saying that I extended the tentative job offers late.  I don't really consider that to be an error.").  The written counseling also advised Dillworth that Strader had requested that he be removed from being the Human Resources Specialist servicing the 1st Brigade, but Robinson was not going to honor that request.  *See* [R. 48-12 (Written Counseling), p. 1].  Instead, Robinson stated that she had noticed an improvement in Dillworth's work while he was on his PIP and that she had "the confidence that [he would] continue to strive to provide better customer service."[9]  *Id.*  Robinson also reminded Dillworth about his obligations to maintain a fully successful level of performance from the commencement date of his PIP.  *See id.* at 2.  Dillworth refused to sign the written counseling.  *See id.*

When Robinson met with Dillworth to issue him the written counseling on August 2, 2019, she asked him to begin keeping track of work assignments and dates for those assignments using

---

[8] Robinson and Bussell both testified that Strader's complaints concerning Dillworth's errors were justified and that they had never received similar complaints about other employees.  *See* [R. 48-3 (Robinson Deposition), pp. 63–67 (175–79)]; [R. 48-7 (Bussell Deposition), pp. 2, 6–8 (125, 129–30, 133)].  Both women also testified that they had received complaints from other individuals about Dillworth's work product.  *See* [R. 48-3 (Robinson Deposition), pp. 63–67 (175–79)]; *see* [R. 48-7 (Bussell Deposition), pp. 2, 6–8 (125, 129–30, 133)].

[9] During his deposition, Dillworth testified that, when Strader "called [his] name out" at a meeting as being late on his actions, Robinson curtailed the criticism directed against him.  *See* [R. 48-2 (Dillworth Deposition), pp. 13–14 (90–91)].

an Excel spreadsheet, which the parties refer to as a "recruitment personnel action tracker" or RPA

Tracker.  *See* [R. 48-3 (Robinson Deposition), pp. 25–26 (249–50)]; *see also* [R. 48-12 (Written

Counseling), p. 1] ("I am providing you an 'Action Tracker' spread sheet that hopefully will aid

you in being able to keep track, annotate and update each RPA assigned to you.  You will complete

the spreadsheet and email it to me and Ms. Bussell NLT 4:00 each Friday beginning, August 9,

2019.").  Dillworth was the only employee who was asked to complete an RPA Tracker, and he

thought the tracker was unwarranted.  *See* [R. 51-1 (Dillworth Deposition), p. 32 (256)].

At his deposition, Dillworth testified that the tracker "took a tremendous amount of time

to complete because it was so highly detailed," which required him "to do double the work because

[he] had to mirror what was put into the event history, had to make sure that everything mirrored

each other."  *Id.* at 18 (80:18–24).  However, Robinson testified that she had "sat down side by

side" with Dillworth to show him how to complete the tracker and estimated that it would only

take five minutes a day to complete.  *See* [R. 48-3 (Robinson Deposition), pp. 11, 18 (64, 83:5–

7)].

Dillworth challenged being asked to keep the tracker, *see id.* at 10–11 (63–64), and shortly

after being assigned the task, he missed the first two deadlines for submitting it to Robinson and

Bussell, which led him to being issued a formal reprimand on August 28, 2019.  *See* [R. 48-13

(Reprimand)].  The formal reprimand reminded Dillworth of his obligations after completing the

PIP.  *See id.* at 1.  Dillworth refused to acknowledge the written reprimand.  *See id.* at 3.  After the

reprimand, Dillworth still did not always complete the tracker on time, but he was not disciplined

for such actions.  *See* [R. 48-4 (Emails), pp. 18–27] (discussing Dillworth's activity relating to the

RPA Tracker); *see also, e.g.*, [R. 48-3 (Robinson Deposition), p. 16 (80)] (discussing issues with

RPA Tracker but noting no action was taken against Dillworth after the reprimand); [R. 48

(Secretary Motion), p. 10] ("Nevertheless, at no point did Robinson further reprimand Dillworth or suspend or terminate him; in fact, Dillworth continued to be employed as a GS-11 as this case was litigated.").

At times during Dillworth's employment at CPAC, his team lead, his supervisor, and his director were all females. *See* [R. 48-2 (Dillworth Deposition), p. 3 (3)]. In his Second Amended Complaint, Dillworth alleges that in 2015 and 2017 (and in 2019-2020) he raised concerns about females in his work area being treated better than males. *See* [R. 22 (Second Amended Complaint), ¶ 12]. He further alleges that:

> By February 2018, Dillworth increased being vocal and raising concerns to his superiors about incongruent treatment of males and noted that the leadership in his area was all female and that the males were being singled out and not getting fair treatment or training. This aggravated the leadership, all female, who began a course of action to harass and treat Dillworth like a pariah, all because of his male status and his complaints of different treatment for males. Such treatment worked to disparately impact males.[10]

*Id.* At some point, Dillworth asked "to be traded from under the leadership" of Bussell and Robinson because he felt he was being discriminated against, but his request was denied. *See* [R. 48-2 (Dillworth Deposition), p. 19 (103)].

In his deposition, Dillworth testified that he was treated differently from females in regard to providing documentation for time off (for instance, having to provide an obituary when his brother died), that he was not offered training like other employees who were female, which he argues led to his performance issues, that Robinson and Bussell "micromanaged" him, and that Bussell would return work to him in a rude manner. *See, e.g.*, [R. 51-1 (Dillworth Deposition),

---

[10] Dillworth has not pointed to any evidence that supports these allegations. Additionally, as an aside, the Court notes that, throughout much of the time period Dillworth alleges he was vocal about the mistreatment of males, he was promoted to new positions and given performance awards by Robinson. *See* [R. 48-1 (Dillworth Employment Records)]; [R. 48-3 (Robinson Deposition), p. 31 (134)].

pp. 1, 34–35 (15, 168–69)]; *see also* [R. 51 (Dillworth Response), p. 2] ("Plaintiff witnessed Robinson and Bussell providing side-by-side training to his female co-workers daily and Plaintiff was not invited to any of the training meetings that were provided to his female counterparts. The result being that Plaintiff, despite being more senior, was less experienced in certain tasks due to not receiving individualized training."). Dillworth testified that he sent emails to his supervisor and let her know directly that he was not receiving the same treatment as others and was not invited to any meetings they were having, but he also testified that he did not recall sending emails in which he requested guidance or training on specific subjects and that he had declined a specific training offered to him in October 2019; no emails to any of this effect appear in the record. *See* [R. 51-1 (Dillworth Deposition), pp. 5–7, 39 (63–65, 184)].

Perhaps most notably, the record is replete with discussion of the more than 100 hours of training that Dillworth *was* provided. *See* [R. 48-2 (Dillworth Deposition), pp. 3–6 (33–36)] (describing the more than 100 hours of training he received); *see also* [R. 48-3 (Robinson Deposition), p. 58 (166:4–7)] (listing training courses that Dillworth and other specialists doing the same work received as including "[b]asic staffing, basic user staff -- HR staffing, HR advisory pay setting, guide the personnel processing actions, qualification standard handbook, time in grade," among others). Indeed, even during the time Dillworth was on his success plan and PIP and when he was asked to complete the RPA Tracker, he was directed to ask questions of Bussell and Robinson, and he met with those individuals on many occasions. *See, e.g.* [R. 48-5 (Memorandum)]; [R. 48-6 (PIP Discussion)]; [R. 48-8 (PIP)]. In this context, Robinson also testified that some of the training provided to female employees was offered to individuals who *had* requested training. *See* [R. 53-1 (Robinson Deposition), p. 2 (54:8–12)] ("Q  Did Almira or

- 13 -

Tamekia ever get additional side by side or on the job training?  A  Sometimes, yes.  Q  Did they ask for it?  A  Yes.").

Dillworth also briefly testified that he was retaliated against once he filed his EEO and MSPB complaints in February 2019.  *See* [R. 51-1 (Dillworth Deposition), pp. 1, 17 (15, 79)]; *see also* [R. 51 (Dillworth Response), p. 4] ("About a month later, in February 2019, Plaintiff filed a complaint with the Merit Systems Protection Board (MSPB) and an EEOC complaint for gender discrimination and retaliation.").  As examples of retaliation, Dillworth pointed to his being assigned a new brigade and to being asked to complete the RPA Tracker.  *See* [R. 51-1 (Dillworth Deposition), pp. 17–18 (79–80)]; *see also* [R. 48 (Secretary Motion), p. 11] (listing actions the Secretary perceived Dillworth based his retaliation claim on as including Dillworth having been told by an individual that Robinson had told that individual that she (the individual) could not help Dillworth, Dillworth's written counseling in August 2019, the RPA Tracker, and the August 2019 reprimand).

Finally, Dillworth offers as proof the affidavits of several coworkers from CPAC, including Kenneth Ferguson, Greg Johnson, Judy Drouin, and Jennifer Organ. *See* [R. 51-3 (Ferguson Affidavit)]; [R. 51-4 (Johnson Affidavit)]; [R. 51-5 (Drouin Affidavit)]; [R. 51-6 (Organ Affidavit)].  These affidavits suggest that Dillworth was treated less favorably by Bussell and Robinson; but while Johnson's and Organ's affidavits reference better treatment being given to female employees, Ferguson's and Drouin's affidavits do not mention gender. *Compare* [R. 51-4 (Johnson Affidavit)]; [R. 51-6 (Organ Affidavit)], *with* [R. 51-3 (Ferguson Affidavit)]; [R. 51-5 (Drouin Affidavit)].  Drouin's and Organ's affidavits also suggest that employees were told they were not allowed to help Dillworth.  *See* [R. 51-5 (Drouin Affidavit)]; [R. 51-6 (Organ Affidavit)].

On September 4, 2020, Dillworth filed his original complaint in this action.[11]  *See* [R. 1]. He was permitted to amend his complaint several times, *see* [R. 7]; [R. 19], and he filed his Second Amended Civil Complaint for Monetary and Equitable Relief on April 2, 2021.  *See* [R. 22]. Dillworth's Second Amended Complaint presented four federal causes of action against the Secretary: (1) gender discrimination; (2) retaliation; (3) hostile work environment; and (4) disparate impact.  *See id.*

On May 4, 2021, the Secretary filed a Motion to Dismiss, *see* [R. 23], which the Court granted in part and denied in part.  *See* [R. 29].  Specifically, the Court granted the motion as to Counts III and IV, finding that Dillworth had not administratively exhausted his hostile work environment and disparate impact claims and that the disparate impact claim, to the extent it was brought pursuant to 42 U.S.C. § 1981(a), was preempted by Title VII.  *See id.* at 10–13, 15–18. However, the Court denied the Secretary's Motion to Dismiss regarding Dillworth's gender discrimination and retaliation claims, finding that these claims had been administratively exhausted and plausibly alleged.  *See id.* at 18–27.  Additionally, the Court struck Dillworth's requests for liquidated and punitive damages, explaining that liquidated damages are unavailable as a remedy for violation of Title VII and that punitive damages are unavailable against a governmental agency (such as the Department of the Army).  *See id.* at 27–30.

Following entry of the Court's Memorandum Opinion and Order on the Secretary's Motion to Dismiss on December 2, 2021, the parties proceeded to engage in discovery.  *See, e.g.*, [R. 35 (Scheduling Order)].  Nearly a year and a half later, on April 7, 2023, the Secretary filed the instant

---

[11] Notably, the record does not reveal that Dillworth was ever demoted or fired during the course of these events.  Instead, the Secretary represents that "Dillworth continued to be employed as a GS-11 as this case was litigated."  [R. 48 (Secretary Motion), p. 10].

Motion for Summary Judgment.  *See* [R. 48].  Dillworth responded to the Motion, *see* [R. 51], and

the Secretary replied, *see* [R. 53].  The Motion stands submitted to review.

## II.      Legal Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  When considering a motion for summary judgment, the Court must construe the evidence

and draw all reasonable inferences from the underlying facts in favor of the nonmoving party.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Lindsay v. Yates*,

578 F.3d 407, 414 (6th Cir. 2009).  The Court may not "weigh the evidence and determine the

truth of the matter" at the summary judgment stage.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 249 (1986).  The Court "need consider only the cited materials, but it may consider other

materials in the record."  Fed. R. Civ. P. 56(c)(3).

The initial burden of establishing that no genuine dispute of material fact exists rests with

the moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party satisfies

this burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a

"genuine issue" for trial.  *Id.* at 324–25.  When, as here, the defendant moves for summary

judgment, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will

be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."

*Anderson*, 477 U.S. at 252.

Further, where "a party fails to properly support an assertion of fact or fails to properly

address another party's assertion of fact," the Court may treat the fact as undisputed.  Fed. R. Civ.

P. 56(e)(2).  A fact is "material" if the underlying substantive law identifies the fact as critical.

*Anderson*, 477 U.S. at 248.  Here, "[o]nly disputes over facts that might affect the outcome of the

suit under the governing law will properly preclude the entry of summary judgment." *Id.* "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.

### III.   Analysis

Following prior motions practice, Dillworth has two remaining claims under Title VII, one for gender discrimination and one for retaliation.[12] *See* [R. 29]. In her Motion, the Secretary argues that no genuine disputes of material fact exist as to either claim and that she is entitled to judgment as a matter of law. *See* [R. 48]. The Court will consider each of Dillworth's claims (and the Secretary's arguments against each claim) in turn.

### a.   Gender Discrimination

Dillworth's first remaining cause of action alleges that he was discriminated against on the basis of his gender while employed at the CPAC in violation of Title VII. *See* [R. 22 (Second Amended Complaint), ¶¶ 40–46]. As a preliminary matter, the Court must consider whether Dillworth proceeds on a single-motive or mixed-motive theory of discrimination. *See Griffin v. Finkbeiner*, 689 F.3d 584, 594 n.7 (6th Cir. 2012) ("We note that single-motive and mixed-motive theories are not distinct claims, but rather different ways of analyzing the same claim.").

---

[12] Dillworth is a federal employee. *See* [R. 22 (Second Amended Complaint), ¶ 2]. Thus, 42 U.S.C. § 2000e–16, which prohibits discrimination by the federal government, governs his claims. *See* 42 U.S.C. § 2000e–16 ("All personnel actions affecting employees . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin."). In their briefing, the parties do not wrestle with or spend much time (if any) discussing how Dillworth's status as a federal employee affects his remaining claims. Even so, it does not appear that Dillworth's status as a federal employee affects the Court's analysis of his discrimination claim (whether based on a single-motive or mixed-motive theory). *See generally Levine v. DeJoy*, 64 F.4th 789, 797 (6th Cir. 2023) (applying familiar framework to federal employee's discrimination claim). However, the distinction between private sector and federal sector claims will be important for Dillworth's retaliation claim. *See supra* § III(b).

- 17 -

A single-motive claim, as the name suggests, alleges that an illegitimate reason motivated an employment decision. *See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 n.4, 396 (6th Cir. 2008); *see also* 42 U.S.C. § 2000e–2(a)(1) ("It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.") (cleaned up).   Notably, single-motive claims based on circumstantial evidence are analyzed through the familiar *McDonnell Douglas/Burdine* burden-shifting framework.   *See White*, 533 F.3d at 391 (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), as subsequently modified by *Texas Dept. of Comm. Affairs v. Burdine,* 450 U.S. 248 (1981)); *see also Levine*, 64 F.4th at 797 (applying *McDonnell Douglas/Burdine* standard to federal employee's Title VII discrimination claim); *Phillips v. Cohen*, 400 F.3d 388, 397 (6th Cir. 2005) (explaining that 42 U.S.C. § 2000e–16 makes the "core discrimination standard" of § 2000e–2 "applicable to certain federal employees"); *Harris v. City of Akron*, 836 F. App'x 415, 418 (6th Cir. 2020) ("When a plaintiff uses circumstantial evidence to show discrimination, courts apply the *McDonnell Douglas / Burdine* framework."); *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606 (6th Cir. 2019) ("A plaintiff may show discrimination by direct evidence, or a plaintiff lacking direct evidence of discrimination may succeed on a Title VII claim by presenting indirect evidence under the framework first set forth in [*McDonnell Douglas*].");   *Hobson v. Austin*, No. 3:17-1485, 2021 WL 602874, at *5 (M.D. Tenn. Feb. 15, 2021), *report and recommendation adopted*, No. 3:17-CV-01485, 2021 WL 973481 (M.D. Tenn. Mar. 16, 2021) (applying *McDonnell Douglas/Burdine* standard to federal employee's claims, including one brought under Title VII).

On the other hand, a mixed-motive claim, again as the name suggests, alleges that there are both legitimate *and* illegitimate reasons that motivated the employer's decision.[13]  *See White*, 533 F.3d at 396; *see also Drerup v. NetJets Aviation Inc.*, No. 22-3475, 2023 WL 4204551, at *11 (6th Cir. June 27, 2023) ("The mixed motive framework applies in cases 'where an adverse employment decision was the product of a mixture of legitimate and illegitimate motives.'");  42 U.S.C. § 2000e–2(m) ("Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.").  Notably, a mixed-motive claim does not follow the *McDonnell Douglas/Burdine* framework.  *See White*, 533 F.3d at 400; *see also Drerup*, 2023 WL 4204551, at *11 n.6 (discussing "different burden-shifting framework [that] applies to mixed-motive claims"). "A plaintiff triggers mixed-motive analysis by giving notice of bringing such claims," and "[t]his treatment can be triggered expressly by invoking the mixed-motive analysis or impliedly through use of the motivating factor test in the complaint and responsive pleadings." *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 649 (6th Cir. 2012).  Relevant here, adequate notice of a mixed-motive claim can be provided in response to a defendant's motion for summary judgment.  *See id.*

In this case, Dillworth first argues (in response to the Secretary's position) that his gender discrimination claim survives summary judgment under the burden-shifting framework.  *See* [R. 51 (Dillworth Response), p. 11] (discussing prima facie case and pretext).  Thus, Dillworth

---

[13] The type of relief available to a plaintiff proceeding under a mixed-motive theory is limited in certain circumstances by statute.  *See Wright v. Murray Guard, Inc.*, 455 F.3d 702, 712 (6th Cir. 2006) (quoting 42 U.S.C. § 2000e–5(g)(2)(B)) ("However, the 1991 Act also provides that the employer's liability will be limited to injunctive and declaratory relief and attorney fees and costs if the employer can establish that it 'would have taken the same action in the absence of the impermissible motivating factor.'  The declaratory and injunctive relief may not include 'an order requiring any admission, reinstatement, hiring, promotion, or payment.'").

implicitly argues that he can survive summary judgment on a single-motive theory. However, he also specifically provided notice of his intent to proceed via a mixed-motive analysis. *See id.* at 14 ("The application of a mixed-motive analysis is appropriate for Plaintiff's gender discrimination claims in order to demonstrate that Defendant's purported legitimate non-discriminatory justifications for their decisions were mere pretext for discrimination."). To ensure a clear record, the Court will discuss Dillworth's gender discrimination claim under both theories. *Cf. Griffin*, 689 F.3d at 594 n.7 (observing that the district court must, at some point, decide whether a case involves mixed motives or a single motive, but that "[t]his decision may not always occur before the summary-judgment stage, because the nature of an employment-discrimination case will often emerge after discovery or even at trial") (cleaned up).

### 1. Single-Motive Analysis

The Court first considers Dillworth's gender discrimination claim under a single-motive theory. Absent direct evidence of discrimination (meaning when circumstantial evidence is relied upon), claims brought pursuant to Title VII's antidiscrimination provision are analyzed under the *McDonnell Douglas/Burdine* burden-shifting framework. *See Wright*, 455 F.3d at 706; *see also White*, 533 F.3d at 391 n.5; *Levine*, 64 F.4th at 797 (applying *McDonnell Douglas/Burdine* standard to federal employee's Title VII discrimination claim); *Phillips*, 400 F.3d at 397 (explaining that 42 U.S.C. § 2000e–16 makes the "core discrimination standard" of § 2000e–2 "applicable to certain federal employees"); *Harris*, 836 F. App'x at 418 ("When a plaintiff uses circumstantial evidence to show discrimination, courts apply the *McDonnell Douglas / Burdine* framework."); *Redlin*, 921 F.3d at 606 ("A plaintiff may show discrimination by direct evidence, or a plaintiff lacking direct evidence of discrimination may succeed on a Title VII claim by presenting indirect evidence under the framework first set forth in [*McDonnell Douglas*].");

*Hobson*, 2021 WL 602874, at *5 (applying *McDonnell Douglas* standard to federal employee's claims, including one brought under Title VII).

In his briefing, Dillworth argues that he has presented direct evidence of discrimination, including that his female coworkers were afforded more formal training and side by side instruction and that he was held to different standards than his female coworkers. *See* [R. 51 (Dillworth Response), pp. 12–13]. However, the Court views these assertions as circumstantial evidence because they do not demand the conclusion that the different treatment as based on Dillworth's gender. *See White*, 533 F.3d at 391 n.5 (explaining that direct evidence of discrimination is "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions," and that circumstantial evidence, "on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred") (cleaned up); *Drerup*, 2023 WL 4204551, at *6 (explaining that "[d]irect evidence is evidence that does not require any inferences to be drawn regarding the employer's motivations," and that, because plaintiff had presented no such evidence, her Title VII claim would be analyzed under the *McDonnell Douglas/Burdine* framework because it was based on circumstantial evidence). For example, Dillworth has not pointed to any comments or documentation from Robinson or Bussell that reference the gender of any employees. *Cf. Ondricko*, 689 F.3d at 650 ("Ondricko asserts she presented direct evidence of race discrimination based on O'Connor's statement to Hannon: '[D]o you think I wanted to fire Kim, I didn't want to fire Kim, how can I keep the white girl.'"). In such a posture, the Court views Dillworth as relying on circumstantial evidence, meaning it will employ the familiar burden-shifting framework to analyze his gender discrimination claim (based on a single-motive theory).

This framework requires a plaintiff to first establish a prima facie case by showing that: "(1) he or she was a member of a protected class; (2) he or she suffered an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees." *See Wright*, 455 F.3d at 707 (internal quotation marks omitted); *see also Levine*, 64 F.4th at 797.

"Once a prima facie case has been shown, the plaintiff is entitled to a presumption that the defendant discriminated against him or her in violation of Title VII." *Wright*, 455 F.3d at 706. "The defendant then bears the burden of production to put forth a 'legitimate, nondiscriminatory reason' for the complained of adverse treatment." *Id.* "The explanation provided must be legally sufficient to justify a judgment for the defendant." *Id.* (internal quotation marks omitted). "If the defendant meets this burden, the presumption of discrimination created by the prima facie case falls away, and the plaintiff then needs to show that the defendant's 'legitimate nondiscriminatory reason' was a 'pretext for discrimination.'" *Id.* at 706–07 (internal quotation marks omitted); *see also Levine*, 64 F.4th at 798 (applying framework).

A plaintiff may demonstrate pretext in a number of ways. As the Sixth Circuit has explained:

> Pretext may be established either directly by persuading the trier of fact that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. A plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action. However, the plaintiff may also demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation.

*White*, 533 F.3d at 392–93 (cleaned up); *see also Levine*, 64 F.4th at 798 (discussing pretext). Importantly, "[t]hroughout this burden-shifting approach, the plaintiff continues to bear the ultimate burden of proving, by a preponderance of the evidence, the intent to discriminate." *Wright*, 455 F.3d at 707; *see also Levine*, 64 F.4th at 798.

In this case, the parties do not dispute the first element of Dillworth's prima facie case (that he is a member of a protected class). Second, the Court will assume that he has suffered at least some adverse employment action (specifically his placement on the PIP). *See* [R. 51 (Dillworth Response), p. 10] (listing actions Dillworth argues were adverse employment actions). The third element also poses no bar because there is no record evidence to suggest that Dillworth was unqualified for his position. However, Dillworth cannot satisfy the fourth element of his prima facie case because he has presented no evidence that he was treated differently than similarly-situated, non-protected employees.

On this point, the Sixth Circuit has found certain factors are relevant in determining whether employees are "similarly situated." *See Middleton v. Lexington-Fayette Urban Cnty. Gov't*, No. 22-6040, 2024 WL 692966, at *6 (6th Cir. Feb. 20, 2024) (quoting *Mitchell v. Toledo Hospital*, 964 F.2d 577 (6th Cir. 1992) (discussing Title VII claim)).[14] "To show that two individuals are similarly situated, the plaintiff 'must have dealt with the same supervisor, have been subject to the same standards[,] and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Id.* (quoting *Mitchell*, 964 F.2d at 583). However, "the nonprotected employee 'need not be identical in every way in order to be a proper comparator.'" *Id.* (quoting

---

[14] *Middleton* itself did not involve a Title VII claim, but its analysis of the "similarly situated" element quoted extensively from Title VII cases. Thus, the Court looks to this recent recitation from the Sixth Circuit for the standards regarding this element of a *prima facie* case.

*Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 304 (6th Cir. 2016) (discussing Title VII claim)). "'Instead, the plaintiff must show that the comparator is similarly situated in all relevant respects and has engaged in acts of comparable seriousness.'" *Id.* (quoting *Tennial*, 840 F.3d at 304). Importantly, the Court makes "an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee based on the facts of the case before [it]." *Id.* (internal quotation marks omitted); *see also Smith v. Adebco, Inc.*, No. 3:21-CV-00833, 2023 WL 5943136, at *4 (M.D. Tenn. Sept. 11, 2023) (applying these standards to Title VII claim).

On this record, Dillworth has wholly failed to point to any similarly situated female who was treated more favorably than he was. First, to the extent Dillworth argues that specific female employees were provided more training, he has failed to show that those individuals were similarly situated in all relevant respects. Indeed, he only mentions these women's names in the facts of his brief, *see* [R. 51 (Dillworth Response), p. 2] (listing Vivian Rush, Myra Majadas, Tamekia Johnson), and does not otherwise engage in analysis specifically related to any of these women and speaks only in generalizations "of how his female counterparts were treated more favorably than him." *See id.* at 11; *see also Middleton*, 2024 WL 692966, at *6 (discussing "similarly situated" element). Moreover, the Secretary has provided evidence that the female individuals who were provided training had requested it, and other evidence suggests those individuals may have needed more advanced direction based on their job duties. *See* [R. 53-1 (Robinson Deposition), p. 2 (54:8–12)] ("Q  Did Almira or Tamekia ever get additional side by side or on the job training?  A  Sometimes, yes.  Q  Did they ask for it?  A  Yes.").

Second, the affidavits that Dillworth relies upon in this action contain virtually no detail to support Dillworth's position that he was treated differently because he is male.[15] *See generally* [R. 51-6 (Organ Affidavit), ¶ 3] (stating that Bussell had provided side by side training two female employees working at the same grade as Dillworth, but refused to sit with him to provide him the same training). Indeed, two of those affidavits do not mention the gender of individuals at all, *see* [R. 51-3 (Ferguson Affidavit)]; [R. 51-5 (Drouin Affidavit)], and the ones that do so are conclusory, *see* [R. 51-4 (Johnson Affidavit)]; [R. 51-6 (Organ Affidavit)]. For example, Johnson attested that Bussell and Robinson treated female employees more favorably than Dillworth and did not provide him with the same training, *see* [R. 51-4 (Johnson Affidavit), pp. 1–2], and Organ attested that Bussell provided training and feedback to female employees that she did not provide to Dillworth, *see* [R. 51-6 (Organ Affidavit), p. 2]. But these assertions are cursory and provide little detail and no specifics, such as names, dates, or the type of training involvement. *Cf. Mitchell*, 964 F.2d at 584–85 ("Even if the Court were to consider the Affidavit, the statements contained therein are nothing more than rumors, conclusory allegations and subjective beliefs which are wholly insufficient evidence to establish a claim of discrimination as a matter of law."). In other words, the affidavits fail to reflect why the mentioned females were similarly situated in all relevant respects.

The reasoning of *Treadwell*, where the court considered the specific individuals put forward by the plaintiff as comparators and found they all were insufficient, is instructive. *See Treadwell*, 716 F. Supp. 2d at 729–33. In particular, the Court notes that, unlike the Court in

---

[15] The Secretary argues the Court should strike three of the affidavits because they were not provided in discovery. *See* [R. 53 (Secretary Reply), p. 5 n.2]. However, the Court's consideration of the affidavits does not change the result: Dillworth has failed to demonstrate a genuine dispute of material fact on his discrimination claim. *See Treadwell v. Am. Airlines, Inc.*, 716 F. Supp. 2d 721, 727 (W.D. Tenn. 2010), *aff'd*, 447 F. App'x 676 (6th Cir. 2011).

*Treadwell*, it is left without any specifics regarding the individuals Dillworth argues were treated more favorably, *see* [R. 51 (Dillworth Response), p. 2], to perform the similarly situated analysis. And the affidavits do not remotely help in this regard, as not one of them mentions *any individual females* by name.  Thus, the affidavits, which contain "only rumors, conclusory allegations and subjective beliefs," fail to assist Dillworth in establishing the fourth element of his prima facie case.  *See Mitchell*, 964 F.2d at 585.

Third, to the extent Dillworth relies on his placement on the PIP, he has failed to identify a single individual who received as many PPP reconstructs who would be an apt comparator, and therefore, cannot show others "engaged in acts of comparable seriousness."  *See Middleton*, 2024 WL 692966, at *6 (quoting *Tennial*, 840 F.3d at 304).  Instead, Robinson testified that she had never had an employee other than Dillworth who had more than three PPP reconstructs in a rating cycle, *see* [R. 48-3 (Robinson Deposition), pp. 46–47 (150–51)], and Bussell similarly testified that she had never been involved in another individual's placement on a PIP and that, in her thirteen years at CPAC, Dillworth was the only person she had seen placed on either a success plan or a PIP, *see* [R. 51-7 (Bussell Deposition), pp. 3–4 (58–59)].  Dillworth himself even admitted in his deposition that he could not point to a single other person who received the same number of reconstructs:

> Q  You said someone else had three PPP reconstructs.  Who was that?
>
> A  Judy Drouin.
>
> Q  You don't allege that Judy Drouin had four PPP reconstructs in any rating period, do you?
>
> A  I believe that there is a possibility that she had, but I know for sure three.
>
> Q  Do you have any evidence that she had a fourth PPP reconstruct in the same rating period?

> A  I don't have any evidence of a fourth one, no.

[R. 51-1 (Dillworth Deposition), pp. 36–37 (178:17–179:2)].   And he further admitted that he could only offer speculation regarding reconstructs that others may have had:

> Q . . . You've told me that she never did PPP reconstructs for other females, and what I'm trying to get at is, do you have proof of that or is that speculation or you're overstating again?
>
> A  Speculation.

*Id.* at 30 (133:13–17).

Fourth, Dillworth's attempts to rely on the written reprimand he received in August 2019 also fail.  *See* [R. 48-13 (Reprimand)].  Again, Dillworth has not identified any female coworker who had a similar history of errors (including placement on a success plan and PIP) who was asked to keep an RPA Tracker.  Instead, Robinson testified that the RPA Tracker was not punitive in nature and was designed to help Dillworth keep track of his work and she had never used the tracker with another employee.  *See* [R. 48-3 (Robinson Deposition), p. 1 (30:15–21)].  The evidence also demonstrates that Dillworth was only issued the reprimand after he failed to timely submit his tracker on the first two deadlines he was given.  *See* [R. 48-13 (Reprimand)].

In such a posture, Dillworth cannot satisfy the fourth element of his prima facie case because he has not identified an apt comparator.  Summary judgment in favor of the Secretary would be proper on this ground alone for Dillworth's discrimination claim based on a single-motive theory.

But even assuming that Dillworth could satisfy the prima facie showing for his discrimination claim on a single-motive theory, the claim still fails because Dillworth has presented *no evidence* to demonstrate that the reasons offered by the Secretary are pretext for discrimination.  *Cf. Rosenthal v. Faygo Beverages, Inc.*, 701 F. App'x 472, 476 (6th Cir. 2017)

- 27 -

("A district court may certainly assume that a plaintiff makes out a *prima facie* case, move past this analytical step, and conclude that summary judgment should be granted to a defendant because the defendant establishes a non-discriminatory reason for its decision to terminate its employee and the plaintiff fails to demonstrate pretext.").

In briefing, the Secretary argues the following reasons support the actions that were taken against Dillworth:

> [i]n the instant case the legitimate proffered reasons for the PIP and the reprimand are obvious and well documented: 1) Dillworth was put on a PIP after he failed his success plan and while he was having significant performance issues; 2) he was reprimanded for failing to follow orders in turning in the tracker on time; 3) as to the claim of denial of training, Dillworth has presented no evidence of a denial of training; and 4) a PIP was mandatory, not discretionary, because Dillworth's fourth PPP reconstruct in a rating period meant he failed a performance element, making a PIP mandatory.

[R. 48 (Secretary Motion), p. 15] (citing [R. 48-2 (Dillworth Deposition), pp. 3–8 (33–38)]; [R. 48-3 (Robinson Deposition), pp. 36–37, 45–46 (139–40, 149–50)]; [R. 48-8 (PIP), pp. 1–2]; [R. 48-7 (Bussell Deposition), pp. 3–4, 11–12 (126–27, 136–37)]).  On the present record, Dillworth is unwholly unable to demonstrate a genuine factual dispute concerning whether the Secretary's reasons are pretextual, whether by showing the reasons had no basis in fact, were not the actual reason, or were insufficient to explain the Secretary's actions.[16]  *See Wright*, 455 F.3d at 707; *see also Levine*, 64 F.4th at 798 (discussing pretext).

First (and fourth), the Court considers Dillworth's placement on the PIP.  Here, the Court observes that Dillworth's placement on the PIP followed months of leadership and clients

---

[16] In his Response, Plaintiff simply argues that "Plaintiff can show that Defendant's alleged nondiscriminatory reasons for the adverse employment actions at issue are pretext for gender discrimination" and drops a footnote referencing the Secretary's proffered reasons. *See* [R. 51 (Dillworth Response), p. 13 & p. 13 n.1] (citing [R. 48 (Secretary Motion), p. 15]).  The Court therefore follows the order of the reasons offered by the Secretary in discussing whether any reasons were pretextual.

identifying issues with his performance and leadership's attempts to help him succeed; it also came after he received his fourth PPP reconstruct, which made placement on the PIP mandatory. *See, e.g.*, [R. 48-4 (Emails)]; [R. 48-5 (Memorandum)]; [R. 48-6 (PIP Discussion)]; [R. 48-8 (PIP)]; [R. 48-3 (Robinson Deposition), pp. 8–9, 36–37 (61–62, 139–40)] (discussing PPP reconstructs and Dillworth's placement on PIP); [R. 48-7 (Bussell Deposition)  pp. 6–8 (129–30, 133)] (discussing Dillworth's errors in servicing Cadet Command).  Against such a backdrop, the Court finds the Secretary's reasoning for Dillworth's placement on the PIP (and before that, the success plan) was reasoned and well documented.  Dillworth argues that his errors were based on a lack of adequate training, but he has provided no evidence to demonstrate that Robinson or Bussell ever denied him training at all let alone that he was denied training because of his gender.

Second, the Court considers the written reprimand issued to Dillworth after he failed to timely submit his RPA Tracker.  Recall that task was intended to assist Dillworth in keeping track of his work.  *See* [R. 48-12 (Written Counseling), p. 1] ("I am providing you an 'Action Tracker' spread sheet that hopefully will aid you in being able to keep track, annotate and update each RPA assigned to you.  You will complete the spreadsheet and email it to me and Ms. Bussell NLT 4:00 each Friday beginning, August 9, 2019.").  Dillworth always challenged having to complete the tracker and viewed it as doubling his work, *see* [R. 51-1 (Dillworth Deposition), p. 18 (80:18–24)], but Robinson testified that she provided Dillworth with side-by-side training on how to use the tracker and estimated that it should have taken no more than five minutes a day.  *See* [R. 48-3 (Robinson Deposition), pp. 11, 18 (64, 83)].  Although Dillworth may dislike that he was asked to complete the tracker, he has offered no evidence that remotely suggests he received the formal reprimand relating to his failure to timely submit the tracker because of his gender.  Instead, the

evidence demonstrates that the reprimand was issued after Dillworth failed to timely submit his RPA Tracker on two occasions. *See* [R. 48-13 (Reprimand)].

Third, the Court considers the training that Dillworth argues he never received. Here, Dillworth argues the Secretary's stated reasons are pretextual because he was never provided sufficient training (because he was a male) before or after his placement on the PIP, meaning he was set up for failure. Although Dillworth testified that he emailed and went to his supervisor directly to explain that he had not been afforded on the job training or side-by-side training like female employees, he also testified that he *never requested specific training* and that on at least one occasion in October 2019, he declined training that was offered to him. *See* [R. 51-1 (Dillworth Deposition), pp. 5–7, 39 (63–65, 184)]. Relatedly, the Secretary has provided evidence that female individuals who were provided training had requested it (and other evidence suggests those individuals may have needed more advanced direction based on their job duties). *See* [R. 53-1 (Robinson Deposition), p. 2 (54:8–12)] ("Q  Did Almira or Tamekia ever get additional side by side or on the job training?  A  Sometimes, yes.  Q  Did they ask for it?  A  Yes.").

Further, the record is replete with emails and discussion of how Bussell and Robinson *did* provide Dillworth with instruction, met with him, and otherwise offered him assistance. *See, e.g.*, [R. 48-4 (Emails)]; *see also, e.g.*, [R. 48-5 (Memorandum)] ("I met with you several times while you were on your Success Plan to discuss your deficiencies."). To be sure, evidence in the record demonstrates that Dillworth was provided training early in his career at CPAC and, more significantly, he was provided training *before, during, and after* his placement on both the success plan and the PIP. *See, e.g.*, [R. 48-2 (Dillworth Deposition), pp. 3–6 (33–36)] (describing the more than 100 hours of training he received); [R. 48-3 (Robinson Deposition), pp. 18, 58 (83, 166:4–7)] (discussing showing Dillworth how to complete the RPA tracker and listing training courses that

Dillworth and other specialists doing the same work received as including "[b]asic staffing, basic user staff -- HR staffing, HR advisory pay setting, guide the personnel processing actions, qualification standard handbook, time in grade," among others); [R. 48-5 (Memorandum)] (discussing Robinson having met with Dillworth on October 11, 2018, to discuss errors he had been making; [R. 48-11 (PIP Completion Memorandum)] ("During the 90 days, I met with you and Sandy, to provide Performance Feedback."); [R. 48-12 (Written Counseling)].   Thus, Dillworth's arguments that the proffered reasons he was not provided training are pretextual fail to comport with the record.

Finally, the Court finds it appropriate to address Dillworth's argument regarding the inability of his coworkers to assist him.  As mentioned above, when Dillworth was placed on his PIP, he was told that he must have certain tasks approved by his team lead and that other GS-11s could not review or assist with his work.  To the extent Dillworth argues this suggests any discriminatory motive, the record demonstrates that Robinson and Bussell wanted Dillworth to go to his team lead or supervisor for assistance (and not to rely on the help of other GS-11s) because they wanted to see whether Dillworth's work product was improving. *See, e.g.*, [R. 48-6 (PIP Discussion)]; [R. 48-8 (PIP)].  In other words, the rationale behind such direction from either Robinson or Bussell to the coworkers was reasoned: they wanted Dillworth to have his work reviewed by the team lead or supervisor and to not have other specialists at the same level assist him because they wanted to ensure he was progressing.  There is no pretext on this ground.

Given the record, the Court finds other courts' dispositions of single-motive discrimination claims support the conclusion that Dillworth has failed to show pretext.[17]  First, *Wright* involved

---

[17] Title VII makes it unlawful for discrimination based on an "individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a)(1).  Thus, cases interpreting Title VII claims on any protected ground are instructive.

a black male who was fired after allegations of workplace misconduct, including sexual harassment, arose involving him. *See Wright*, 455 F.3d at 704–05. In considering the plaintiff's race discrimination claim, the court found that he had established a prima facie case but failed to show pretext. *See id.* at 707–09. Specifically, the court found that the plaintiff had "offered no evidence" to indicate that the employer made its decision on grounds other than those offered, including the plaintiff's performance problems and numerous allegations that the plaintiff had sexually harassed other employees. *See id.* at 708–09 ("Although Wright contends that Bradley had a motive to lie, this unsupported contention does not create a question of fact regarding Murray Guard's assertion that it honestly believed that Wright had sexually harassed its employees.").

Second, *Qui v. Board of Education of Scott County*, a decision by the Eastern District of Kentucky from last year, involved an individual of Chinese origin who sued a school board under Title VII after she was not hired for a teacher position. *See* No. 5:21-CV-00197-GFVT, 2023 WL 3690228, at *1 (E.D. Ky. May 26, 2023). Upon review, the court granted summary judgment to the school board on the plaintiff's national origin discrimination claim under Title VII, finding the plaintiff had not carried her burden to demonstrate pretext. *See id.* at *4. Specifically, the court found that the plaintiff had "present[ed] nothing beyond her own suspicion to support her belief that her national origin was the actual reason that Scott County rejected her applications." *See id.*

As in *Wright* and *Qui*, where the courts found the plaintiffs' speculation concerning the reasons for actions taken against them were insufficient to create a genuine factual dispute regarding pretext, so too here. Indeed, as discussed above, Dillworth has provided only his own suspicion, or as he described it in his deposition, "speculation," as to why he was treated differently from other employees. *See also* [R. 51-1 (Dillworth Deposition), p. 30 (133:17)]. To quote the court in *Qui*, such "suspicion is insufficient without 'evidence that the employer's proffered

reasons were factually untrue.'" *Qui*, 2023 WL 3690228, at *4 (quoting *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 470 (6th Cir. 2002)). Dillworth has offered no evidence to that effect. *See Mitchell*, 964 F.2d at 585 ("Courts have repeatedly held that the plaintiff's denial of the defendant's articulated legitimate reason without producing substantiation for the denial is insufficient for a race discrimination claim to withstand a motion for summary judgment.").

In determining whether an employer reasonably relied on the particularized facts then before it, the Court does "not require that the decisional process used by the employer be optimal or that it left no stone unturned." *Wright*, 455 F.3d at 708 (internal quotation marks omitted). "Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.* (internal quotation marks omitted). In this case, the Secretary has provided reasonable explanations for why Dillworth was placed on the PIP (and the success plan), why he was asked to keep the RPA Tracker, why he was issued a written reprimand, how Dillworth had been trained before, during, and after his placement on the PIP (and the success plan), and why his coworkers were told not to assist him with work. Dillworth may disagree with the Secretary's reasons or how his performance deficiencies were handled, but he has offered no evidence that the Secretary's actions were pretextual.

Such a conclusion is further bolstered by the "same actor inference," which the Secretary argues applies to the facts of this case. *See also* [R. 48 (Secretary Motion), p. 16]; *see Mencarelli v. Alfred Williams & Co.*, 656 F. App'x 80, 87 (6th Cir. 2016) ("The same-actor inference allows one to infer a lack of discrimination from the fact that the same individual both hired and fired the employee.") (internal quotation marks omitted). Here, the Court observes that Robinson was the same individual who: hired Dillworth; promoted him; gave him performance awards; and, perhaps most strikingly, *refused to remove him from serving Cadet Command* (despite Cadet Command

asking for someone else to serve it) because she had noticed an improvement in his work while he was on his PIP and had "the confidence that [he would] continue to strive to provide better customer service." [R. 48-12 (Written Counseling), p. 1].

Although Dillworth argues that the same-actor inference is inapposite in this case (because of the time that passed between when he was hired and when he asserts Robinson took actions against him and because Bussell was not responsible for hiring or promoting him),[18] the Court notes that the inference only serves to support its earlier conclusion that there is no genuine dispute of material fact regarding pretext in this case. *Cf. Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 573–74 (6th Cir. 2003) ("We therefore specifically hold that where, as in this case, the factfinder decides to draw the same-actor inference, it is insufficient to warrant summary judgment for the defendant if the employee has otherwise raised a genuine issue of material fact.").

For all these reasons, the Secretary is entitled to summary judgment on Dillworth's gender discrimination claim on a single-motive theory.

## 2. Mixed-Motive Analysis

The Court now considers Dillworth's gender discrimination claim under a mixed-motive theory based on circumstantial evidence.[19]  As mentioned above, a mixed-motive claim is not subject to the *McDonnell Douglas/Burdine* burden-shifting framework.  Instead, "to survive a defendant's motion for summary judgment, a Title VII plaintiff asserting a mixed-motive claim

---

[18] In his Response, Dillworth suggests that the five-year gap between when he was hired and when he initiated this litigation serves to make the same-actor inference inapplicable.  *See* [R. 51 (Dillworth Response), p. 13].  However, although the passage of time may weaken the inference, it does not destroy it.  *See Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 464 (6th Cir. 1995).

[19] A plaintiff can rely on direct or circumstantial evidence for a mixed-motive theory.  *See White*, 533 F.3d at 400 ("[I]t is irrelevant, for purposes of a summary judgment determination, whether the plaintiff has presented direct or circumstantial evidence in support of the mixed-motive claim[.]").  As discussed above, Dillworth relies only on circumstantial evidence.

need only produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) 'race, color, religion, sex, or national origin was *a* motivating factor' for the defendant's adverse employment action." *White*, 533 F.3d at 400 (quoting 42 U.S.C. § 2000e–2(m)) (emphasis in original); *see also Smith v. City of Toledo*, 13 F.4th 508, 514 (6th Cir. 2021) ("A plaintiff can characterize a racial discrimination claim as single-motive (i.e., that race was the sole motivating factor) or mixed-motive (i.e., that race was a motivating factor among other, legitimate factors).") (citing *White*, 533 F.3d at 396); *see also Drerup*, 2023 WL 4204551, at *11 ("The mixed motive framework applies in cases where an adverse employment decision was the product of a mixture of legitimate and illegitimate motives.") (internal quotation marks omitted); *McCormick v. Gasper*, No. 22-1033, 2022 WL 16586621, at *3 n.1 (6th Cir. Nov. 1, 2022) (citing *White*, 533 F.3d at 400) ("[A] mixed-motive framework does not require the use of the *McDonnell-Douglas* burden-shifting framework.  It is not an onerous standard and allows a plaintiff to prevail on a motion for summary judgment by providing circumstantial evidence that race was a 'motivating factor' in an employment practice.").

"In order to reach a jury, the plaintiff is not required to eliminate or rebut all the possible legitimate motivations of the defendant as long as the plaintiff can demonstrate that an illegitimate discriminatory animus factored into the defendant's decision to take the adverse employment action." *White*, 533 F.3d at 401.  Thus, "[t]he only question that a court need ask in determining whether the plaintiff is entitled to submit his claim to a jury in such cases is whether the plaintiff has presented sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that 'race, color, religion, sex, or national origin was a motivating factor for' the defendant's adverse employment decision." *Id.*; *see also Drerup*, 2023 WL 4204551, at *11 ("A

different burden-shifting framework applies to mixed-motive claims, where '[o]nce the plaintiff has shown that the unfavorable employment decision was made at least in part on a discriminatory basis, the burden shifts to the employer to prove by a preponderance of the evidence that it would have taken the same adverse action even if impermissible factors had not entered into its decision.'") (quoting *Wexler*, 317 F.3d at 571).

As before, the Court will assume that at least one of the actions Dillworth argues (specifically, his placement on the PIP) constitutes an adverse employment action. But even doing so, the Court again concludes that Dillworth's gender discrimination claim (based on a mixed-motive theory) fails because he has produced *no evidence* from which a reasonable jury could conclude that the actions taken against him were motivated in any way by his gender. *See Wright*, 455 F.3d at 713.

The record evidence discussed above in relation to the parties' disagreement over pretext is germane to this analysis. First, Dillworth admitted in his deposition that he could not point to a single other person who received the same number of reconstructs, and he further admitted that he could only offer speculation regarding reconstructs that others may have had. [R. 51-1 (Dillworth Deposition), pp. 30, 36–37 (133:17, 178–79)]. Similarly, Dillworth testified that he did not recall emailing anyone to request specific training and he admitted that he denied a training offered to him in October 2019. *Id.* at 5–7. And the record indicates that female individuals who did receive training had asked for it and that they may have needed more advanced direction. *See* [R. 53-1 (Robinson Deposition), p. 2 (54:8–12)]. Additionally, to the extent that Dillworth attempts to rely on the affidavits submitted by coworkers (only two of which even mention the gender of any employees), those affidavits are simply too conclusory to create a genuine issue of material fact, as the Court has previously discussed. *Cf. Wright*, 455 F.3d at 713 ("Many of Wright's arguments

in support of his mixed-motive claims are conclusory allegations unsupported by any evidence and thus cannot create a genuine issue of material fact.").

Moreover, the record is clear, as discussed above, that Dillworth was adequately trained and promoted frequently before he began to have documented and significant performance problems and that Robinson and Bussell both tried "to help Mr. Dillworth be more successful in his work." [R. 48-3 (Robinson Deposition), p. 2 (42:13–14)] (discussing the success plan). To be sure, Robinson and Bussell counseled Dillworth and met with him frequently to discuss performance issues, and based on those issues, Dillworth was appropriately placed on a success plan, then placed on a PIP, and later asked to keep the RPA Tracker. *See supra* § II (discussing factual history of Dillworth's performance errors). When Dillworth failed to timely submit his RPA Tracker, he was reprimanded, but even after that event, he was not again disciplined (even though he continued to miss the deadline for submitting the tracker). *See* [R. 48-3 (Robinson Deposition), p. 16 (80)] (discussing issues with RPA Tracker but noting no action was taken against Dillworth after the reprimand). Dillworth has simply offered no evidence other than speculation and conclusory allegations that his gender was a factor in the Secretary's decision-making.

Instead, considering that the critical question for Dillworth's discrimination claim based on a mixed-motive theory is whether he can show by a preponderance of the evidence that his gender was "a motivating factor" in the actions taken against him, the Court concludes that the record conclusively answers that question in the negative. In many regards, the facts of this case line up with the Sixth Circuit's analysis in *Wright*, which found the plaintiff's speculation and conclusory assertions (and the specific evidence relied upon) insufficient to create a genuine

dispute of material fact on a mixed-motive theory.[20]   *See Wright*, 455 F.3d at 713.   In particular, the court explained that the inference of an unlawful motive argued by the plaintiff was unsupported by the record because the plaintiff's misconduct merited different treatment than another individual received.   *See id.* at 713.   Similarly here, Dillworth has offered no evidence that demonstrates the different treatment he received was unmerited given his performance issues, including the four PPP reconstructs, which made his placement on the PIP mandatory.   *See* [R. 48-3 (Robinson Deposition), pp. 36–37, 40–41 (139–40, 143–44)].

Although it is true that the "burden of producing some evidence in support of a mixed-motive claim is not onerous and should preclude sending the case to the jury only where the record is devoid of evidence that could reasonably be construed to support the plaintiff's claim," *White*, 533 F.3d at 401, this case falls within the second part of that guidance.   Simply stated, Dillworth has presented no evidence that could reasonably be construed to support his claim that any actions taken against him were on the basis of his gender.   *See Wright*, 455 F.3d at 713.   He therefore has failed to demonstrate a genuine issue of material fact exists for his gender discrimination claim to proceed to a jury on a mixed-motive theory, and the Secretary is entitled to summary judgment as to this claim.

### b.  Retaliation Claim

---

[20] *Wright* was decided before the Sixth Circuit's decision in *White*, which determined the standard for a mixed-motive claim is the same whether based on direct or indirect evidence; however, the Court in *White* approved of the standard used in *Wright*.   *Compare White*, 533 F.3d at 400 (citing *Wright*, 455 F.3d at 716) (Moore, J., concurring) ("An employee raising a mixed-motive claim can defeat an employer's motion for summary judgment by presenting evidence—either direct or circumstantial—to 'demonstrate' that a protected characteristic was a *motivating factor* for an employment practice, even though other factors also motivated the practice."), *with Wright*, 455 F.3d at 713 ("The ultimate question at summary judgment on a mixed-motive case is whether the plaintiff has presented evidence, direct or circumstantial, from which a reasonable jury could logically infer that a protected characteristic was *a motivating factor* in the defendant's adverse employment action against the plaintiff.") (cleaned up) (emphasis in original).

Dillworth's other remaining claim alleges that he was retaliated against after he filed his EEO and MSPB complaints and after he complained to management.  *See* [R. 22 (Second Amended Complaint), ¶¶ 47–51]; *see also* [R. 51 (Dillworth Response), p. 20] ("In this case, it is undisputed that Plaintiff engaged in protected activity (EEO, complaints to leadership, MPSB, and otherwise being vocal)."). This claim is also brought under Title VII, as "[t]he 1964 Civil Rights Act protects from retaliation employees who have opposed discriminatory employment practices." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007); *see also Zickefoose v. Austin*, No. 2:22-CV-1935, 2023 WL 7167001, at *4 (S.D. Ohio Oct. 31, 2023) ("The Court's analysis therefore assumes that § 2000e–16 permits a federal employee to bring a retaliation claim under Title VII.").

However, the proper legal framework that applies to Dillworth's retaliation claim, as a federal sector employee, is not entirely clear under the case law; nor have the parties briefed the issue.  *See Zickefoose*, 2023 WL 7167001, at *5 n.1 ("Defendant's briefing, as well as several decisions of the United States Court of Appeals for the Sixth Circuit, unfortunately elide the distinction between the federal-sector and private-sector provisions of Title VII and the ADEA."). Some federal sector cases like *Jones v. Vilsack*, employ the burden-shifting framework from *McDonnell Douglas* that applies to private sector claims of retaliation.  *See Jones v. Vilsack*, 861 F. App'x 58, 61 (6th Cir. 2021).  In doing so, those cases ask whether the plaintiff can show a prima facie case with the following elements: "(1) he engaged in a protected activity; (2) the protected activity was known by the Agency; (3) the Agency took an action that was materially adverse to him; and (4) a causal connection existed between the protected activity and the materially adverse action." *Id.* (employing a "but-for causation" standard).  The burden then shifts to the defendant to offer legitimate, nonretaliatory reasons for its actions, before it shifts back to the plaintiff to show that the proffered reasons were not the true reasons for the employment

decisions but were instead pretextual. *See id.*; *see also Seifu v. Postmaster Gen., U.S. Postal Serv.*, No. 1:19-CV-572, 2021 WL 4745416, at *13 (S.D. Ohio Oct. 12, 2021), *aff'd sub nom. Seifu v. Postmaster Gen. of United States*, No. 21-4068, 2022 WL 19835788 (6th Cir. Dec. 12, 2022) (applying burden-shifting framework to federal employee's Title VII retaliation claim).

But still other cases recognize that federal sector Title VII claims are more analogous to Age Discrimination in Employment Act cases, which the Supreme Court has found employ different standards of causation based on the type of relief that is sought. *See Zickefoose*, 2023 WL 7167001, at *4 ("The Supreme Court held that a federal-sector ADEA plaintiff must demonstrate that age was the but-for cause of the employment decision only when seeking reinstatement, backpay, compensatory damages, or other forms of relief related to the end result of an employment decision. If seeking injunctive or other forward-looking relief, then the federal-sector ADEA plaintiff must demonstrate only that the personnel action was not untainted by any consideration of age.") (quoting *Babb v. Wilkie*, 589 U.S. 399 (2020)) (cleaned up). Under this rationale, if the plaintiff seeks only forward-looking relief, then the analysis can be treated like the mixed-motive analysis performed above. *See id.* at *6 ("The Court can discern no practical difference between *Babb*'s guidance that § 2000e–16 is violated if retaliation plays any part in the way a decision is made and § 2000e–2(m)'s prohibition on the use of protected characteristics as a motivating factor for any employment practice. The Court therefore concludes that no showing of pretext or comparator employees are necessary to establish liability on a federal sector Title VII claim for retaliation under *Babb*'s 'untainted' causation standard.") (internal quotation marks and citation omitted); *cf. Barta v. Austin*, No. 2:20-CV-1641, 2022 WL 1749051, at *4 (S.D. Ohio Mar. 18, 2022), *reconsideration denied*, No. 2:20-CV-1641, 2022 WL 1061934 (S.D. Ohio Apr. 8, 2022)) ("Accordingly, Plaintiff can succeed on his [ADEA] retaliation claim either (1) by

demonstrating that his complaints of age discrimination were the but-for cause of his non-selection (*i.e.*, by making out a 'single-motive' claim), or (2) by demonstrating that, although there may have been other, non-retaliatory reasons for his non-selection, his complaints of age discrimination were nevertheless among the reasons for his non-selection (*i.e.*, by making out a 'mixed-motive' claim).").

In this case, Dillworth seeks economic and compensatory damages, and he does not explicitly seek injunctive or forward-looking relief. *See* [R. 22 (Second Amended Complaint), p. 13] (listing types of relief sought). Thus, it seems that the but-for causation standard would be the appropriate standard of causation, and the Court should employ the burden-shifting analysis discussed above (like for a single-motive claim). *See Zickefoose*, 2023 WL 7167001, at *6. Here, the Court will assume that Dillworth can meet the first three elements of his prima facie case, and specifically that at least some of the actions taken against him (*e.g.*, individuals being told they could not assist him, the written counseling he received after the Cadet Command incident, the RPA Tracker, the reprimand, and Dillworth being assigned an additional brigade) could constitute an adverse employment action.[21] *See Seifu*, 2021 WL 4745416, at * 13 ("The definition of a materially adverse action differs in the retaliation context. Instead of proving a material change in the terms of employment, a plaintiff claiming retaliation need only show that a reasonable employee would have found the challenged action to be materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.") (cleaned up). But Dillworth has wholly failed on this record to point to any

---

[21] Notably, Dillworth's placement on the success plan and the PIP preceded his filing of the EEO and MSPB complaints in February 2019 by several months.

evidence that demonstrates his protected activity was the "but for" cause of any of these actions taken against him.

To the contrary, as discussed above, the written counseling Dillworth was issued in August 2019 came after he made another error in serving Cadet Command, as did the request that he keep the RPA tracker. *See* [R. 48-12 (Written Counseling)]. The written reprimand was likewise issued to Dillworth for his failure to submit the RPA Tracker in a timely manner as directed. *See* [R. 48-13 (Reprimand)]. And Robinson's and Bussell's direction to Dillworth's coworkers that they were not to assist him reflects their desire to be able to evaluate Dillworth's work on its own merits.

Further, regarding the additional brigade, Dillworth argues in his response that shortly after he filed his EEO and MSPB complaints, he "was assigned a new brigade causing even more hardship which led to Plaintiff falling behind resulting in more PPP reconstructs [] which constitutes retaliation for filing his MSPB and EEOC complaints." [R. 51 (Dillworth Response), p. 4]. But Robinson testified that Dillworth was given a new brigade following a reorganization at CPAC where additional brigades were received so distribution was made "to make it even across the board." *See* [R. 48-3 (Robinson Deposition), p. 61 (172:7–10)].

Against this backdrop, Dillworth has wholly failed to point to any evidence that ties the actions taken against him in August 2019 to the complaints he filed in February of that year, let alone that his protected activity was the "but for" cause of any actions taken against him. In many aspects, this case is like *Jones*, where the court discussed how an "intervening cause" can break the chain of causation. *See Jones*, 861 F. App'x at 62. Whereas *Jones* involved (in one regard) a complaint that led the agency to look into allegations of sexual harassment by the plaintiff, *see id.*, Dillworth's continued errors and failure to timely submit his RPA Tracker constitute intervening reasons for the actions taken against him.

It is also worth noting that, to the extent Dillworth argues that the temporal proximity between his protected activity and any adverse actions demonstrates a retaliatory motive, *see* [R. 51 (Dillworth Response), p. 20] (citing *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (citing *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 365 (6th Cir. 2001)), case law holds that the more time that passes between the protected activity and the alleged retaliatory conduct will require a plaintiff to point to temporal proximity *and other evidence* to satisfy the causation element, *see Cook v. McHugh*, 193 F. Supp. 3d 866, 873 (M.D. Tenn. 2016).  The time between Dillworth's EEO and MSPB complaints in February 2019 and the actions taken against him nearly six months later place Dillworth's claims within the realm of when other evidence is needed.  *See id.* (quoting case law finding four-month period too long to establish prima facie case); *see also Jones*, 861 F. App'x at 63 (delay of seven months too long).  As just discussed, Dillworth has pointed to no such evidence.

Relatedly, this case is unlike those where the Sixth Circuit has found a plaintiff has presented sufficient evidence to suggest that, after he had filed an EEO complaint, his employer "heightened its supervision of him in an attempt to find a seemingly legitimate reason to fire him." *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 437 (6th Cir. 2009).  To be sure, Dillworth has pointed to no evidence that the Secretary waited (after he filed his EEO and MSPB complaints) to find a seemingly legitimate reason to take any action against him.  Rather, his documented performance issues began several months prior to his EEO/MSPB complaints, and he had already been through a success plan (which he failed) and placed on a PIP (which he eventually completed), when he filed such complaints.  Dillworth simply cannot satisfy the causation element of his prima facie case.  But even if he could, he would still be unable to demonstrate pretext, for the reasons the Court has previously discussed.  *See supra* § III(a).

Moreover, even if the other causation standard applies to Dillworth's retaliation claims and he must only show that his protected activity played *any role* in the actions taken against him, the result is the same: Dillworth's retaliation claim fails. *See Seifu*, 2021 WL 4745416, at *14 (discussing private sector claims and their but-for causation standard and then acknowledging that "[r]ecent case law suggests that federal employees may be able to establish a causal connection if they can prove that retaliation played 'any' role") (citing *Babb*, 589 U.S. 399). This result is compelled by all the reasons previously discussed: Dillworth has wholly failed to point to any evidence demonstrating his protected activity motivated any of the actions taken against him. Without such evidence, his retaliation claim fails, even under a lower standard of causation. *See id.* ("Here, however, even if the Sixth Circuit were to hold that the retaliation need only constitute 'a factor' rather than the 'but-for' cause of the various adverse actions alleged, Plaintiff has come forward with no evidence at all to raise the inference that her filing of the 2016 EEO complaint was a motivating factor for the various actions of which she complains.").

Because Dillworth has failed to demonstrate that a genuine issue of material fact exists regarding causation on his retaliation claim (under any standard of causation), the Secretary is entitled to summary judgment on this claim.

## IV.    Conclusion

For the foregoing reasons, and with the Court being otherwise sufficiently advised,

**IT IS HEREBY ORDERED** as follows:

1. The Secretary's Motion for Summary Judgment **[R. 48]** is **GRANTED**.

2. A separate judgment **SHALL** issue.

This the 27th day of February, 2024.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY